2008 BNH 016
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 05-56003-MWV |
| | Chapter 11 |
| Whispering Pines Estate, Inc., | Jointly Administered Cases |
| d/b/a The Pines at Edgewood Centre, | |
| and | |
| AMI-Burlington, Inc., | |
| d/b/a The Anchorage Inn, | |
|         Debtors | |

*Jennifer Rood, Esq.*
BERNSTEIN, SHUR, SAWYER & NELSON, PA
*Attorney for Debtors*

*William S. Gannon, Esq.*
WILLIAM S. GANNON, PLLC
*Attorney for Flash Island, Inc.*

## MEMORANDUM OPINION

The Court has before it Whispering Pines Estate, Inc.'s (the "Debtor") amended plan of reorganization dated August 17, 2007, and Flash Island, Inc.'s (hereinafter, "Flash") objection to confirmation. On February 1, 2008, the Court held a confirmation hearing on the plan and took the matter under advisement.

Also pending before the Court is Flash's second motion for relief from the automatic stay. On December 21, 2007, the Court made certain factual findings but deferred ruling on the motion pending the confirmation hearing.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).[1] This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## BACKGROUND

The Debtor is a New Hampshire subchapter S corporation that owns and operates a thirteen-room, sixteen-bed, residential assisted living facility in Portsmouth, New Hampshire (the "Facility"). The Facility is fully occupied, and all of its residents are private paying clients. David Ramsey is the Debtor's president and sole shareholder. Mr. Ramsey is also the sole shareholder of AMI-Burlington, Inc. (hereinafter, "AMI"), a corporation affiliated with the Debtor that owns and operates The Anchorage Inn located in South Burlington, Vermont. On November 16, 2005, the Debtor and AMI separately filed for protection under chapter 11 of the Bankruptcy Code. On November 29, 2005, the Court administratively consolidated their cases, but they have separate debts and separate plans of reorganization.

Flash is a secured creditor in the Debtor's case. On March 15, 2006, Flash filed two proofs of claim against the Debtor for $489,769 (the "First Secured Claim") and $920,606 (the "Second Secured Claim"). The First Secured Claim is based on a $425,000 loan that the Debtor obtained from Flash, and it is secured by a first mortgage on the Facility. The Second Secured Claim is based on an $850,000 promissory note that Flash obtained by assignment, and it is secured by a second mortgage on the Facility and the Debtor's personal property. The Debtor originally obtained the $850,000 loan from Pioneer

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8.

Capital Corporation (hereinafter, "Pioneer"), with AMI serving as the guarantor. On December 15, 2005, Pioneer assigned the note to Flash.

On September 18, 2007, Flash filed its second motion for relief from the automatic stay to exercise its rights against the Facility and the Debtor. On October 31, 2007, the Court held a hearing on the matter and took it under advisement. On December 21, 2007, the Court issued a memorandum opinion and entered an order deferring a ruling until after the Plan's confirmation hearing. In that order, the Court found that the Facility value is $1,525,000, there is no equity in the Facility, and Flash's second lien position is impaired under the Plan.

## DISCUSSION

A plan of reorganization generally may be confirmed only if it satisfies all the requirements of 11 U.S.C. § 1129(a). Flash argues that the Court should deny confirmation because the Plan is not feasible and violates multiple provisions of section 1129(a). The Debtor maintains that the Plan complies with all section 1129(a) requirements.

The Court begins its confirmation analysis with the feasibility issue raised by Flash. Flash argues that all the financing stated in the Plan is speculative and will not generate sufficient funds to cover its two secured claims and other claims. As such, Flash argues that the Plan violates section 1129(a)(11). Section 1129(a)(11) provides that courts shall confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This confirmation requirement is referred to as the feasibility requirement. See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 801 (5th Cir. 1997). A plan of reorganization is feasible if it offers "a reasonable assurance of success." Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2nd Cir. 1988); see In re T-H New Orleans Ltd. P'ship, 116 F.3d at 801 (providing that the feasibility

requirement is satisfied if the plan offers a reasonable assurance of commercial viability). "Success need not be guaranteed." In re Johns-Manville Corp., 843 F.2d at 649. "The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence." In re T-H New Orleans Ltd. P'ship, 116 F.3d at 801.

### A. The Plan

The Plan proposes to provide full payment of all allowed claims, with interest, within two years of its effective date (the "Commitment Period"). (Plan 1.) The Debtor's disclosure statement identifies the following claims to be paid: (1) $1,409,000 in secured claims held by Flash ($489,000 First Secured Claim + $920,000 Second Secured Claim);[2] (2) $115,000 in secured claims held by the Internal Revenue Service and the City of Portsmouth; (3) approximately $235,600 in administrative claims; and (4) approximately $60,000 in general unsecured claims. (See Disclosure Statement 4.) These debts total $1,819,600.

The Plan proposes to pay all claims in the following three stages and from three sources: (1) initial payments from a $1,050,000 loan from Hallock Ryno Investments, Inc. (hereafter, "HRI"), which will be secured by a first priority lien on all of the Debtor's property (the "Exit Financing"); (2) additional payments from the Debtor's operating revenues; and (3) final payment from the new financing that the Debtor will obtain for an expansion of the Facility (the "New Construction Financing").[3] (Plan 1-2.) The Plan provides that the Debtor will obtain the New Construction Financing

---

[2] The Court notes that since the petition date, the Debtor made a total of $96,000 in adequate protection payments and that interest has accrued on both claims. For purposes of conducting a feasibility analysis, however, the Court will not consider these factors because they do not significantly affect the Court's analysis.

[3] The Court notes that on March 13, 2008, the Debtor filed an amended confirmation order deleting all references in the Plan to an avoidance action by the Debtor against Flash related to the Second Secured Claim. (Order ¶ 23.) As such, the Court will treat the Second Secured Claim as a valid claim in the feasibility analysis. The Court also notes that the Debtor has not objected to Flash's proof of claim asserting the Second Secured Claim.

on or before the Exit Financing's maturity date in an amount sufficient to provide for the balance due under the Exit Financing, payment on certain remaining claims, and a twelve-bed expansion of the Facility.  (Plan ¶ 1.35.)  Lastly, the Plan also provides that the Debtor will obtain a supplemental loan up to $250,000 from William and Janice Beynon to finance an initial four-bed expansion of the Facility (the "Supplemental Beynon Loan"), which the Debtor alleges will increase its cash flow.  (See Plan ¶ 1.42.)

      B.      **Financing Likelihood**

The Plan's feasibility hinges on the Debtor securing the financing contemplated in the Plan.  As such, the Court must first determine whether the Debtor is likely to obtain the Exit Financing, New Construction Financing, and Supplemental Beynon Loan.  First, with regard to the Exit Financing, there was no commitment letter from HRI at the time of the confirmation hearing.  Mr. Ramsey testified that HRI is prepared to make the loan, but no HRI representative attended the hearing and gave testimony to that effect.  Although HRI provided the Debtor with term sheet documents for the loan and the Debtor alleges that HRI closed a loan with AMI based on similar documents, the Court does not find such circumstances assuring.  These facts indicate that by the confirmation hearing, for reasons unclear, HRI extended the financing to AMI but not to the Debtor.  AMI's plan of reorganization is also up for confirmation at this point.  As such, the Court is not convinced that the Debtor will obtain the Exit Financing.

Second, the New Construction Financing is speculative. The Debtor did not produce documentary evidence of such financing.  Although Mr. Ramsey testified that he had preliminary discussions with multiple parties on the issue, the Debtor failed to propose how or from whom this financing will be obtained.  This financing is important in the feasibility analysis because the Plan relies on the proceeds of the New Construction Financing to satisfy remaining claims at the end of the Commitment Period.

Lastly, with regard to the Supplemental Beynon Loan, Mr. Beynon testified that he has to obtain a personal loan to make the Supplemental Beynon Loan to the Debtor.  As of the confirmation hearing,

Mr. Beynon had not filled out a loan application. Moreover, Mr. Beynon's son is the titled owner of the real property that Mr. Beynon intends to mortgage for the personal loan. His son did not appear at the confirmation hearing to give testimony that he agrees to the financing transaction. As such, the Supplemental Beynon Loan is also speculative.

In view of the record before it, the Court concludes that the Exit Financing, New Construction Financing, and Supplemental Beynon Loan are not likely to occur. Without such financing, there is no reasonable assurance of the Plan's success and the Plan fails to satisfy section 1129(a)(11).

    **C.**     **Underfunding Issue**

Nonetheless, even assuming that the Debtor obtains the Exit Financing, the Plan is not feasible because it does not provide sufficient funding to satisfy all the claims. The Exit Financing amount is $1,050,000. After loan fees, the Debtor will have net proceeds of $971,400. (Disclosure Statement 7.) The disclosure statement provides the following distribution of the net proceeds: (1) $150,000 payment toward unclassified claims, which include administrative expenses and priority claims; (2) $489,000 payment to Flash in full satisfaction of the First Secured Claim; and (3) the balance of the Exit Financing proceeds to Flash in partial satisfaction of the Second Secured Claim, leaving a balance of approximately $587,600 ($920,000 Second Secured Claim - $332,400 Exit Financing balance). (See Disclosure Statement 7-8.) After the Exit Financing is exhausted, the Plan will need to account for the interest accrued on the First Secured Claim and Second Secured Claim,[4] the $587,600 balance on the Second

---

[4] In the Court's memorandum opinion on Flash's second motion for relief from the automatic stay, the Court recalculated Flash's first and second notes using the contract rate of interest and arrived at $541,214 for the First Secured Claim and $1,022,527 for the Second Secured Claim.

Secured Claim,[5] and over $260,000 in other claims[6] (collectively, the "Outstanding Claims"). Together, the Outstanding Claims exceed $800,000.

The Plan proposes to satisfy the Outstanding Claims with the proceeds from the Whispering Pines-AMI Note, the Debtor's operating revenue, and the New Construction Financing. First, the Whispering Pines-AMI Note is a secured note in the amount of $760,871 that a reorganized AMI is to give the Debtor. Under that note's terms, the Debtor will generate approximately $105,000 during the Commitment Period, which will be applied exclusively to pay down the $587,600 balance on the Second Secured Claim.[7] The Debtor states in its post-hearing brief that it will make a final payment on the Second Secured Claim at the end of the Commitment Period by refinancing AMI in April 2009. (Debtor's Post-Hr'g Br. 17.) However, the record does not support any prospects of such refinancing, and the proceeds from the Whispering Pines-AMI Note are insufficient to satisfy the balance on the Second Secured Claim in full.

Second, the Debtor's cash flow projections for 2008 and 2009 show a net operating revenue of $178,609.[8] At the confirmation hearing, the Debtor offered testimony that it expected its revenue to increase due to rate increases on its residents and additional cash flow from a four-bed expansion of the Facility. With respect to the Debtor's rate increases, any such increase will probably be insufficient to resolve the Plan's underfunding issue. With respect to the four-bed expansion, as already discussed, the

---

[5] To satisfy the Second Secured Claim's balance, the Plan proposes the Flash Island Plan Note. That note will have the same maturity date as the Exit Financing (two years) and will be secured by Flash's existing second priority lien and the Whispering Pines-AMI Note. (Plan ¶¶ 1.31 and 3.2.) During the Commitment Period, the Plan proposes to pay down that note with the proceeds of the Whispering Pines-AMI Note.

[6] $1,819,600 total debt - $971,400 net Exit Financing proceeds - $587,600 Flash remaining claim.

[7] The Whispering Pines-AMI Note has a term of ten years, during which, AMI is to pay $7,500 monthly installments for the months June through December each year ($52,500 each year). (See Plan ¶ 1.43.)

[8] The Debtor's net revenue projections during the Commitment Period are $25,530 for 2008 and $153,079 for 2009, after payments on the interest for the Exit Financing. (Disclosure Statement Ex. 2.)

Supplemental Beynon Loan is speculative.  Moreover, even assuming that the Debtor obtains that loan, the Debtor did not offer documentary evidence or testimony that such expansion is physically or legally permissible under state and local rules.  Mr. Ramsey testified that there are no permits in place for the expansion.  As such, the Court does give much weight to the anticipated increase in cash flow alleged by the Debtor.

Third, to the extent the Plan relies on the New Construction Financing, the Plan also fails because such financing is speculative.  Based on the figures stated above ($105,000 Whispering Pines-AMI Note proceeds and $178,609 projected net operating revenue), the Debtor will have insufficient funds during the Commitment Period to satisfy the Outstanding Claims, which exceeds $800,000.  Accordingly, even assuming that the Debtor obtains the Exit Financing, the Plan does not satisfy the feasibility requirement under section 1129(a)(11).

## CONCLUSION

For the reasons set out herein, the Court denies confirmation of the Debtor's plan of reorganization because it fails to satisfy 11 U.S.C. § 1129(a)(11).  As the Court finds grounds to deny confirmation under section 1129(a)(11), it need not address Flash's remaining objections.

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.  The Court will also issue a separate order on Flash's second motion for relief from the automatic stay.

DATED this 8th day of December, 2008, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge